**SEABURN INC., Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

Civ. A. No. 88–637.

United States District Court, District of Columbia.

April 20, 1989.

Elmer C. Maddy, Maddy, Dalton & Lion, New York City, for plaintiff.

Ashley Doherty, U.S. Dept. of Justice, Washington, D.C., David M. Gravallese, U.S. E.P.A., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter comes before the court on cross-motions for summary judgment. The matter has been extensively briefed.

*Background*

In 1972 Congress passed the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. §§ 1401–1444 (1977), commonly known as the "Federal Ocean Dumping Act" ("the Act"), to "prevent or strictly limit the dumping in ocean waters of any material[1] which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1401(b). To further these ends Congress prohibited most forms of ocean dumping unless authorized by a permit issued by the Environmental Protection Agency ("EPA"). *See* 33 U.S.C. § 1402(b), (c), (e). Under the Act, EPA may issue two types of permits: short-term "research" permits or "special" (commercial operating) permits. The Act charges the EPA Administrator with promulgating regulations for "reviewing and evaluating" applications for ocean dumping permits, including consideration of specific environmental factors,[2] as well as alternatives to ocean dumping and incineration. EPA may issue a permit only after it determines that: (1) there are no practicable

---

1. Material includes

    matter of any kind or description, including, *but not limited to,* dredged material, solid waste, *incinerator residue,* garbage, sewage, sewage sludge, munitions, radiological, chemical and biological warfare agents, radioactive materials, chemicals, biological and laboratory waste, wreck [sic] or discarded equipment, rock, sand excavation debris, and industrial, municipal, agricultural, and other waste

    . . . .

33 U.S.C. § 1402(c) (emphasis supplied).

2. The EPA is required to consider the effects of the proposed dumping or incineration on human health and welfare, economic, aesthetic and recreational values, fisheries resources, wildlife, shorelines and beaches, marine ecosystems, the persistence and permanence of such effects, the effect of dumping on alternate uses of the oceans, and whether feasible locations exist beyond the Continental Shelf. *See* 33 U.S.C. §§ 1412(a)(B), (C), (D), (E), (F), (H), (I).

technological improvements that will reduce adverse impacts, and (2) there are no practicable alternatives available that have less adverse environmental impact or potential risk. 40 C.F.R. § 227.16(a)(1), (2) (1987). Although EPA issued its first permit in 1974, it did not publish regulations governing the issuance of both types of permits until 1977. *See* 40 C.F.R. §§ 220–233 (1986).

EPA has long interpreted the ban-without-permit provisions to include ocean incineration.[3] The EPA stated that

> in any case where it can reasonably be anticipated that incineration of wastes at sea will result in any such material, or *emission from the incineration of such material*, entering ocean waters, such incineration will require a permit under the Ocean Dumping Act. (emphasis supplied).

39 Fed.Reg. 37,058 (October 17, 1974).

*Present Posture of Regulations*

In November 1983 two public hearings were held on a commercial waste disposal company's application for both special (commercial) and research ocean incineration operating permits.[4] Chem Waste's application triggered EPA solicitation of public comments both on the application *and* "on the principles [to be] used in developing the proposed permits and their role as a model for specific criteria regulating ocean incineration." Defendants' Statement of Material Facts Not in Dispute, ¶ 4 p. 2. The intense public interest in the subject is reflected by the fact that over 6,000 people registered at the two hearings. In May 1984 Chem Waste's operational application was deferred pending promulgation of rules governing ocean incineration. In February 1985, after reviewing the comments received at the hearings, EPA published proposed ocean incineration research rules. 50 *Fed.Reg.* 8222 (February 28, 1985). During the second comment period

the Agency received over 5,000 separate comments relating to the proposed rules. In reaction to the public's "widespread and critical" response to some of the proposed regulations, including the permitting section, the Agency decided to solicit additional comment.

In the interim, its application for a commercial permit having been deferred and its application for a research permit having been denied, 51 *Fed.Reg.* 20,344 (June 4, 1986), Waste Management Inc., Chem Waste's parent company, filed suit in Federal District Court in the District of Columbia to compel EPA to issue a research permit to Chem Waste. *Waste Management, Inc. v. United States Environmental Protection Agency*, 669 F.Supp. 536 (D.D.C.1987). Waste Management claimed that the agency's deferral pending promulgation of ocean incineration rules was "conduct that the agency intended to follow in the future," and as such constituted rulemaking. Plaintiff asserted that the Agency had violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, which requires public notice and comment whenever a substantive rule is promulgated. *Waste Management*, 669 F.Supp. at 539. A rule is categorized as "substantive" if it "substantially affects" or "jeopardizes" the ultimate interest of the parties. *See Environmental Defense Fund v. Gorsuch*, 713 F.2d 802, 815 (D.C.Cir.1983); *Waste Management*, 669 F.Supp. at 539. On the other hand, under the APA, "interpretive rules, general statement of policy, or rules of agency organization, procedure or practice," 5 U.S.C. § 553(b)(A) (1977) are exempt from the notice and comment requirements. On September 16, 1987 the federal trial judge found that EPA's temporary permit freeze fell within that exception on the ground that the Agency's deferral was procedural rather than substantive rulemaking. *Waste Management*, 669 F.Supp. at 539–40. The court held that

---

**3.** Ocean incineration is a process that converts some of the liquid waste into "residues" or emissions which are then "dispersed into the atmosphere and generally deposited into the ocean." *See* Defendants' Motion for Summary Judgment at 7.

**4.** The applicant, Chemical Waste Management, Inc. (Chem Waste), a subsidiary of Waste Management Inc., is not a party to this action.

because the effect on Chem Waste was temporary, its ultimate interests were not fully compromised. Thus, the trial judge held, the Agency's action was exempt from the notice and comment requirement.[5] Following this decision, however, in February 1988, in an action the Agency describes as a shift of resources from ocean disposal into other environmental programs with higher priority, EPA announced that it would *completely,* rather than temporarily, suspend development of at-sea incineration regulations.[6]

*Present Litigation*

One month later, on March 9, 1988, plaintiff Seaburn Inc. ("Seaburn"), a commercial waste disposal company, filed the present action. Seaburn is self-defined as a company "engaged ... in the research, development, construction and operation of vessels and equipment" for ocean incineration of liquid hazardous wastes. Seaburn originally challenged EPA's decision to suspend its evaluation of Seaburn's application for an ocean incineration permit pending development of final ocean incineration regulations. Plaintiff argued that an indefinite suspension of permit review is tantamount to revocation of existing regulations. As

such, its ultimate interests have been compromised without the benefit of the APA's notice and comment procedures.[7]

Recently an important legislative development has overtaken this case. Since the filing of this litigation, Congress passed the Ocean Dumping Ban Act of 1988 ("Dumping Ban Act"), Pub.L. No. 100–688, Title I, 102 Stat. 4139, amending the original Marine Protection, Research and Sanctuaries Act of 1972. Section 1002 of the Dumping Ban Act deletes part of § 104A and adds a new section, 104B, which prohibits the issuance of new dumping permits and phases out all sewage sludge and industrial waste dumping by 1991. Both parties filed Supplemental Memoranda simultaneously to analyze the effect of the Dumping Ban Act on the present litigation.

## I

The Ocean Dumping Ban Act amends the 1972 Act and adds the following:

Prohibition on New Entrants—The Administrator shall not issue any permit under this Act which authorizes a person to dump into ocean waters, or to trans-

---

5. The judge also found that the Agency's decision to defer ocean incineration applications pending the promulgation of new rules was rational, and, therefore, the Agency's actions comported with the Administrative Procedure Act.

6. Despite EPA's statements to the contrary, the appendix to the United States Government fiscal year 1989 budget identifies developing criteria for ocean incineration as a major activity of the EPA. *See* Plaintiff's Statement of Material Facts Not in Dispute, ¶ 19 p. 7.

7. Plaintiff asserts a number of procedural and substantive challenges on APA grounds to the EPA's freeze. First, Seaburn argues that EPA's indefinite suspension of permit review is, in fact, a revocation of existing regulations and, as such, constitutes substantive rulemaking. Seaburn asserts that the holding in *Waste Management* is that procedural rulemaking requirements imposed by the APA include notice and comment. *See* Plaintiff's Motion for Summary Judgment at 18. However, the court clearly held in *Waste Management* that a procedural rule is "not subject to the notice-and-comment provisions of the Administrative Procedure Act." *Waste Management Inc. v. United States Environmental Protection Agency,* 669 F.Supp. 536, 540 (D.D.C.1987). We assume that plaintiff in-

tended to discuss notice and comment requirements applicable to substantive rulemaking. Seaburn distinguishes the EPA's action in *Waste Management* from the present circumstances. Seaburn argues that the *Waste Management* decision is predicated on the court's finding that EPA's temporary suspension of the application process was merely an internal procedural change. Seaburn suggests that the subsequent indefinite suspension of ocean incineration rulemaking can not be considered a change in method of operation. Rather, Seaburn views this change as substantive rather than procedural because the freeze effectively jeopardizes and alters Seaburn's ultimate rights and interests. Therefore, Seaburn asserts, the freeze was not exempt from § 553's notice and comment requirement and the EPA is in violation of the APA. Second, Seaburn claims that the EPA's indefinite suspension violates the APA in that the Agency's action was arbitrary, capricious, and an abuse of discretion. Plaintiff claims that the "revocation" of a rule requires the Agency to supply a reasoned analysis for the change and defendant's failure to articulate a formal explanation in the Federal Register is grounds for finding the agency's action arbitrary and capricious.

port for the purposes of dumping into ocean waters, sewage sludge or industrial waste, unless that person was authorized by a permit issued under section 102 or by a court order to dump into ocean waters, or to transport for the purpose of dumping into ocean waters sewage sludge . or industrial waste on September 1, 1988. § 104B(a)(2).

Seaburn claims that the Act does not apply to its proposed operations. It emphasizes the distinction between ocean incineration and ocean dumping is readily apparent and suggests that the court need look no further than the title of the amendment (the Ocean *Dumping* Ban Act) and high school chemistry to recognize this important distinction. It argues that it is not the incineration of waste that gives rise to the need for the permit, but rather the "consequential disposal of the residues (emissions) in the ocean." Plaintiff's Supplemental Memorandum at 5. Plaintiff contends that incinerator residue is not industrial waste and is not, therefore, the intended subject matter of the ban. Plaintiff asserts that the Ocean Dumping Ban Act adds a new and superceding definitional section that defines industrial waste as "any solid, semisolid, or liquid waste generated by a manufacturing or processing plant," new § 104B(k)(4), and that definition cannot be extended either to *stack emissions* or *incinerator residue;* first, because both are the result of an incineration process rather than from a manufacturing or processing plant; second, because stack emissions "are by their nature gases" and gases are not included in the new definition; and third, because incineration "destroys" 99.99% of the industrial waste.[8]

EPA, on the other hand, asserts that the recent amendment prohibits it from issuing new permits to anyone other than current permittees. Because its application for a permit was never approved,[9] Seaburn is a "new entrant" within the meaning of § 104B(a)(2) and EPA is barred from issuing a permit to Seaburn. EPA also states that under the Ocean Dumping Ban Act only those applicants proposing to burn something other than sewage sludge or industrial waste are eligible for review. EPA does not address Seaburn's claim that incinerator residue or stack emissions[10] were not intended to be included in the new definition of industrial waste and does not characterize stack emissions as solid, semisolid, liquid, or gas. EPA attempts to counter Seaburn's argument with the following: first, only the original Act defines "dumping," and it does so as "the deposition of material" into the ocean, 33 U.S.C. § 1402(f); second, ocean incineration is a form of ocean dumping because it involves the "depositing into the ocean of stack emissions;" and third, stack emissions are included in the broad definition of prohibited "materials." Therefore, according to EPA, Seaburn's proposed activities fit squarely within the prohibition which demonstrates Congress' intent to eliminate at-sea disposal of all forms of industrial waste whether generated by an industrial plant or by incineration.

## II

The single question before the court is whether EPA's decision to forego consideration of Seaburn's permit application is based on a reasonable interpretation of the Ocean Dumping Ban Act as amended. Seaburn vigorously objects to EPA's position that the amendment is a total prohibition

---

**8.** Seaburn also claims that the Dumping Ban Act was intended "simply to terminate the dumping of sewage sludge and industrial waste by nine municipalities and one private corporation." However, a review of the legislative history of the amendment indicates that Congress directed the amendment to current and future ocean dumpers. It is disingenuous for Seaburn to suggest otherwise.

**9.** EPA claims to have "repeatedly given Seaburn notice that it considers [Seaburn's] application to be incomplete" and that EPA considered itself

"relieved of any obligation to consider it further." Defendants' Motion for Summary Judgment at 25.

**10.** In EPA's Motion for Summary Judgment, stack emissions are not distinguished from incinerator residue. However, in its Supplemental Memorandum, EPA asserts that incinerator residue (ash), the material that remains after incineration, is distinguishable from stack emissions which are discharged into the air during incineration.

on depositing any material in the ocean whether by incineration or conventional dumping, asserting that Congress had no intention of banning incineration at sea.

Our standard of review in evaluating both agency interpretation of congressional acts and agency regulations issued pursuant thereto was set forth by the Supreme Court in *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the intent of Congress is clear, both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. at 2781. However, if congressional intent is unclear, that is, if the statute is silent or ambiguous with respect to a subsequent agency interpretation, the court must determine whether Congress contemplated just such an interpretation or whether the agency is acting outside the scope of its authority. In making that assessment a court should consider whether the agency's interpretation is "reasonable" in light of the statutory language, the legislative history of the law, and the purpose of the Act. *Id.* at 859–65, 104 S.Ct. at 2790–93.

The legislative history is not a model of clarity. It is plain that the language of § 104B explicitly and broadly prohibits the dumping of sewage sludge or industrial waste by new entrants and by all dumpers by 1991. However, the definition section, 104B(k)(4), states that "for the purpose of this section," industrial waste is declared to mean "any solid, semisolid, or liquid waste generated by a manufacturing or processing plant...." In the context of these proceedings, neither the general prohibition section, 104B(a), nor the definitional language of the amendment, 104B(k)(4), has a precise application to ocean incineration. Unless the amendment's words are placed in the "context of achieving particular objectives," *see Chevron,* 467 U.S. at 837, 104 S.Ct. at 2779, we are unpersuaded that a ban on incineration can be readily imputed to Congress. On the other hand, we can not believe that Congress, with its increasing awareness of environmental concerns, intended to replace the definition of prohibited "material" provided in 33 U.S.C. § 1402(c), which includes "matter of any kind or description," and which would prohibit the depositing of *any* material into the ocean, with the new, more narrow definition in the Ocean Dumping Ban Act as amended. However, because of this ambiguity we turn to the legislative history.

The legislative history of the section is only slightly more illuminating. The Conference Report merely confirms that the purpose of the amendment is to end ocean dumping. H.R.Conf.Rep. No. 1090, 100th Cong., 2d Sess. 24 (1988). However, in the Joint Explanatory Statement, which includes a definitions' analysis section, the Committee went so far as to preclude EPA itself from making after-the-fact determinations that a particular type of material could be dumped. *Id.* at 35. The Conference Report, although not determinative, suggests that EPA would be prohibited from even considering Seaburn's claim that the stack emissions, which float from the incineration stack into the "marine environment," are 99.99% free of toxic waste, and, therefore, not industrial waste within the definition, because the emissions would still contain some toxic materials. Nonetheless, the Conference Report, standing alone or taken together with the statutory language, does not conclusively end the matter. However, what remains clear from the legislative history is Congress' unequivocal intention to initiate a moratorium, if not complete cessation, of dumping industrial waste in ocean waters. 134 Cong.Rec. H16,685–89 (daily ed. October 18, 1988).

In view of this history we turn now to consider whether EPA's interpretation of the Ocean Dumping Ban Act is sufficiently rational to be entitled to the traditional deference accorded an agency interpretation of a statute. We believe that it is. For the purposes of this amendment EPA equates ocean incineration with ocean dumping and interprets the amendment as a bar to further consideration of Seaburn's permit application. We conclude that it was entirely reasonable for the EPA to determine that a prohibition of dumping industrial waste includes all material, irrespective of its altered or reduced toxic content. It is also highly unlikely that Congress intended to prohibit the dumping of industrial waste while permitting the

dumping of other materials included in the original statute, such as chemical and biological warfare agents or stack emissions. Such a narrow and literal reading of the amendment would be incompatible with the purpose of the statute. The court concludes that nothing in the legislative history or the language of the statute itself compels us to substitute plaintiff's views on the merits of incineration for those of the Agency charged with interpreting Congress' environmental mandates. Moreover, judicial review of "highly technical questions," such as the nature of toxic pollutants, is necessarily "deferential to an agency's expertise." *MCI Cellular Telephone Company v. FCC*, 738 F.2d 1322, 1333 (D.C.Cir.1984); *Chemical Waste Management, Inc. v. EPA*, 869 F.2d 1526 (D.C.Cir.1989) (Lexis, Genfed library, USApp file). The EPA in our opinion is faced with many complex problems surrounding ocean incineration and should not be pressured in its consideration of final regulations in the context of an application for a permit by a single applicant. It is, therefore,

ORDERED that defendants' motion for summary judgment is granted and this case shall stand dismissed.